UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
Western Division

| | |
|---|---|
| In re NEWCARE HEALTH CORPORATION, et al., ) | Chapter 7<br>Case No. 99-44161<br>Jointly Administered |

|  |  |
|---|---|
| GARY M. WEINER, Chapter 7 Trustee of ) <br> NewCare Health Corporation, et al., ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> CHRISTOPHER F. BROGDON, et al., ) <br> ) <br> Defendants. ) | Adversary Proceeding No.<br>01-4188 |

### AFFIDAVIT OF PAULA M. BAGGER IN OPPOSITION
### TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

I, Paula M. Bagger, being duly sworn, depose and say:

1       I am a member in good standing of the bar of the Supreme Judicial Court of the

Commonwealth of Massachusetts, and of this Court, and a partner in the Boston, Massachusetts law firm

of Cooke, Clancy & Gruenthal, LLP ("Cooke, Clancy"). Cooke, Clancy is court-appointed special

counsel to Gary M. Weiner, the Chapter 7 Trustee of the bankruptcy estates of NewCare Health

Corporation, et al. ("NewCare")  I make this affidavit of my own personal knowledge.

2.       My first exposure to the NewCare documents at issue came in May 2001, shortly after

Cooke, Clancy was appointed special counsel to William A. Brandt, Jr., the Chapter 11 Examiner of the

NewCare bankruptcy estates. The NewCare documents were at that time located in a warehouse owned

by the *Berkshire Eagle* in Lenox, Massachusetts.  I spent two days in that warehouse, reviewing those

documents. There were hundreds of corrugated cardboard boxes of documents, as well as filing cabinets (with documents inside), and office furniture. Mr. Brandt's counsel in the Chapter 11 proceeding, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., had given me a 93-page index of the documents in the boxes and filing cabinets at the Lenox warehouse. This index had in fact been started by NewCare itself, when it first shipped its documents from Atlanta to Lenox, Massachusetts. It had been augmented by Lenox Healthcare (manager of NewCare before and after the bankruptcy petitions) when the documents arrived in Massachusetts, and was completed and revised by Cooke, Clancy when it undertook this adversary proceeding.

3.      On these first trips to Lenox, I was able to locate the basic documents of the case (corporate minute book, annual reports, management contracts) as well as other documents easily. The only real difficulty I faced was physically locating particular numbered boxes -- a problem that no longer exists now that the boxes are at a professional storage facility, Bay State Records Center. After I completed my initial review, one of our paralegals spent one or two days at the Lenox facility and retrieved additional boxes of potentially relevant documents and brought them back to Boston.

4.      In the spring of 2002, the case converted to a Chapter 7 liquidation and Gary M. Weiner was appointed Chapter 7 Trustee. One of Mr. Weiner's first actions was to remove the boxes of NewCare documents from the warehouse in Lenox and place them at a professional storage facility, Bay State Records Center, in Chicopee, Massachusetts. In August 2002, the boxes were transferred to Chicopee. I decided that Cooke, Clancy needed to review all of the documents before they were checked into the storage facility, to avoid incurring unnecessary expenses to review boxes later on. On two days in August, 2002, two lawyers, one paralegal, and one summer clerk from our firm travelled to Chicopee

2

and reviewed all of the boxes, which were temporarily placed in a warehouse room at Bay State Records Center. On one of those two days, we were assisted by Mr. Weiner and a paralegal and summer clerk from Mr. Weiner's firm. Together, we conducted a brief review of each box, indexed those boxes that were not on the original index created for Lenox Healthcare, and corrected the existing index when we found an erroneous description of the contents of a box. With Mr. Weiner's permission, we disposed of some boxes that did not contain document but rather old office supplies or outdated law books, as the cost of storing the boxes was far greater than the value of these items. Also with Mr. Weiner's permission, we removed approximately fifty boxes of documents to Cooke, Clancy's offices in Boston., and Mr. Weiner removed a smaller number of boxes to his offices in Springfield. These removals were duly noted on the master document index first created by NewCare, augmented by Lenox Healthcare and finally corrected and revised by Cooke, Clancy.

5.    Bay State Records Center informed us that it would need to rebox the documents, not because the boxes were damaged but rather because the records storage facility requires the use of boxes of a uniform size. The boxes in which the documents had been shipped from Atlanta were too large to fit on the shelves at Bay State Records. The boxes were moved into new boxes but were kept in the same order in which they had been shipped from Atlanta (or, in the case of documents generated or used by Lenox Healthcare in the course of managing NewCare) from Lenox Healthcare's offices in Lenox and retained their original file folders, labels, and other means of organization. The documents remain in the same order and filed in the same manner as when they were shipped by NewCare to Lenox.. Bay State Records Center maintained a spreadsheet for its own use so that documents identified by the numbers appearing on the master document index (created for Lenox and revised by Cooke, Clancy) could be

3

located in their new boxes at the storage facility. Initially, Bay State failed to include a number of the boxes on its tracking spreadsheet, but it has agreed to remedy this administrative glitch.

6. The Trustee made his initial disclosures in this case in September 2002. As part of those initial disclosures, the Trustee appended the then-current version of the master document index. No objection to this response was raised by any defendant. The remaining defendants did not serve any document requests until August 2003, when they served 173 requests for production of documents on the Trustee. In response, the Trustee agreed to produce any non-privileged documents in his possession, custody, or control, but declined to order the documents by request number. In response to this document request the Trustee has:

    o     identified and copied and sent to defendants approximately 12,000 pages of responsive documents, most of which relate to the IBM computer system containing NewCare's financial records, which is in the Trustee's possession;

    o     made available approximately 78 boxes of documents that are at Cooke, Clancy's Boston office, which  defendants have reviewed and tagged them for copying;

    o     produced photocopies of the documents he has received in response to the six  third-party document subpoenas served in this matter; and

    o     made available to defendants documents it has received under the cooperation clause in its settlement agreements with the settling defendants in this matter.

7. Finally, and most significantly, the Trustee has agreed to notify defendants when it retrieves additional documents or boxes of documents from Chicopee and produce any such documents to defendants.  There will be no "unfair surprise" to defendants caused by documents stored in Chicopee.

4

8.    On October 8, 2003, one defendant (Mr. Rees) and one of defendants' counsel reviewed approximately forty boxes of documents at the offices of Bay State Records in Chicopee. They identified six boxes of documents containing documents they wished copied. Because they never gave copying instructions for these boxes of documents, the Trustee has moved them to Boston as well, for the greater convenience of counsel.

9.    Between October 20 and December 2, 2003, the remaining 23 defendants in this case collectively produced 3138 pages of documents to the Trustee, or an average of 136 pages per defendant. Only on December 2, 2003, did the Trustee learn that defendants considered this rather modest document production complete. Also on December 2, 2003, the Trustee learned that defendants had changed their position on the close of discovery, refusing to assent to a further extension of discovery unless the Trustee made other, unrelated concessions. Accordingly, the Trustee immediately noticed the ten depositions to which he is entitled as a matter of right. Those depositions are going forward on mutually convenient dates.

10.   On November 3, 2003, defendants took the deposition upon oral examination of Chris Henderson, formerly employed by NewCare Health Corporation. True and accurate photocopies of pages 165 through 172 of this deposition are appended hereto as Exhibit A.

11.   On November 7, 2003, defendants commenced but did not complete the deposition upon oral examination of Thomas Clarke, formerly the President of Lenox Healthcare, Inc. True and accurate photocopies of pages 64 through 65 of this deposition are appended hereto as Exhibit B.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 23rd DAY OF DECEMBER, 2003.

Paula M. Bagger

5

A

Page 1.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

2

3    IN RE:                              )
                                         ) CASE NO. 99-44161
4    NEWCARE HEALTH CORPORATION, et al.,)
                                         ) CHAPTER 7
5          Debtor.                       )
     _____    )

6

     GARY M. WEINER, CHAPTER 7 TRUSTEE, )
7                                        )  ADVERSARY
                                         )  PROCEEDING
8          vs.                           )
                                         )  NO. 2001-4188
9    CHRISTOPHER BROGDON, et al.,        )
                                         )
10         Defendant.                    )

11   _____

                DEPOSITION OF CHRIS HENDERSON
12                  NOVEMBER 3, 2003
                      9:45 A.M.
13   _____

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 ● 3455 Peachtree Road, N.E. ● Atlanta, Georgia  30326 ● www.premierrptg.com
404-237-1990
800-317-5773

Page 162

1  Q   This is a multi-document exhibit, No. 10.
2  Having looked at it, Mr. Henderson, can you tell me
3  what these documents relate to?
4     A   It appears to be correspondence, the
5  first one an E-mail from me to David actually
6  indicating -- referring to scheduling of a truck to
7  come pick up documents, furniture and other items
8  maintained in a storage facility.
9     Q   Does that have anything to do with what
10 you were just testifying about, the transfer of
11 documents from the Atlanta facility?
12    A   This is unrelated to that. They were --
13 there are actually three separate -- there are three
14 separate events, the first of which several 18-wheelers
15 loaded up with stuff from the corporate offices and all
16 that information was taken to Pittsford.
17    Q   Let's stick with that, then. That's all
18 the documents?
19    A   Not necessarily all the documents, but
20 some of the documents. Again, I don't know what was
21 included -- what the distinction was between the first
22 big mass exodus, which I believe occurred in June --
23 probably late June, early July, possibly. , Again, I
24 don't recall the specific dates, but that's trucks that
25 pulled up and pulled stuff out of the 6000 Lake Forrest

Page 163

1  location. All that stuff was transferred up to
2  Pittsford, Massachusetts. That was cost reports, tax
3  returns, bank statements, you know, day-to-day
4  accounting-related stuff, was all shipped off up to
5  Pittsford.
6     Q   Were these all the NewCare and affiliate
7  records?
8     A   NewCare and affiliate records that were
9  boxed up and shipped out. Again, that occurred
10 sometime in either late June or early July. That's the
11 first event that occurred.
12    Q   How do you know about that one?
13    A   I was there. We were still in that
14 office up until the end of July.
15    Q   You're talking about big moving vans?
16    A   Big 18-wheelers.
17    Q   How many were there?
18    A   I believe there were two.
19    Q   Were you working for NewCare at the time
20 or were you working for Lenox Health Care?
21    A   At that time, I would have been working
22 for Lenox Health Care, I believe.
23    Q   What role or responsibility did you have
24 at that time in connection with the movement of those
25 records?

Page 164

1     A   I was the one who was appointed
2  responsible for moving the boxes. I don't know if
3  you're asking what was my official title at Lenox
4  Health Care.
5     Q   Were you the one who decided which boxes
6  went and which stayed?
7     A   No. I believe they sent down a listing
8  and said, "Here's all the stuff that we want," and that
9  was the first batch of stuff that went up, and it was
10 desks and furniture and boxes and a host of different
11 items that all went up in the first batch.
12    Q   That all went up to Lenox Healthcare's
13 office up in Pittsford?
14    A   It went to Lenox Healthcare's office in
15 Pittsford.
16    Q   Were there any company records that were
17 left behind from that move?
18    A   I believe there were.
19    Q   What, if you know?
20    A   I think anything associated with active
21 Medicare, Medicaid billing. But, again, I couldn't
22 tell you exactly what was left behind.
23    Q   Do you know if the boxes — were the
24 records boxed for shipment?
25    A   Yes.

Page 165

1     Q   Can you approximate the number of boxes
2  of records that were included in that first shipment?
3     A   I don't recall how many boxes there were.
4     Q   Were they in the hundreds?
5     A   It's possible, but I don't recall. It
6  was a significant volume of boxes.
7     Q   Do you know who boxed the records for
8  shipment?
9     A   I don't recall.
10    Q   Do you know if there were records
11 included in those records that were not NewCare
12 documents?
13    A   I seem to recall that there was some
14 issue associated with documents for a non-affiliated
15 company that were accidentally included in there, and
16 Phil sent me a memo to that effect and requested that I
17 forward that on to the folks at Lenox Health Care and
18 request them back.
19    Q   Did you?
20    A   I think I did. I forwarded it on Phil's
21 request.
22    Q   Do you know if Lenox Health Care returned
23 those non-affiliate records?
24    A   I have no idea.
25    Q   Is the contents in the Atlanta storage

Page 166

1　document to Dan Moore that appears in part of Exhibit
2　No. 10, the second page, a description of what went in
3　this first shipment or in a later shipment?
4　　　A　This is in a later shipment. These are
5　items that were moved from a storage facility here in
6　Atlanta later in the year. It seems from this E-mail
7　that it was sometime in November. They were moved from
8　the storage facility up in Atlanta up to Pittsfield,
9　Massachusetts.
10　　　Q　I remember that you were talking about
11　three shipments --
12　　　A　Right.
13　　　Q　-- of contents at 6000 Lake Forrest.
14　　　A　Right, the first of which occurred -- the
15　first of which occurred sometime in June or July,
16　documents that went up relating to cash and payroll and
17　items such as that. The second movement of documents
18　and furniture occurred in August when we moved the
19　billing function from 6000 Lake Forrest over to the
20　location 10 miles down the road. That's the second
21　movement of documents. And the third was the movement
22　of documents from the 6000 Lake Forrest to a storage
23　facility.
24　　　Q　Is that third one, the movement to the
25　storage facility, the one that's reflected in the

Page 167

1　documents that make up Exhibit No. 10?
2　　　A　This is the result of that movement. It
3　moved from 6000 Lake Forrest to storage. It sat in
4　storage for several months and then was moved from
5　storage to Pittsfield, Massachusetts.
6　　　Q　Were you involved in all of those
7　shipments of documents?
8　　　A　I was.
9　　　Q　So the first, the second and third
10　shipments?
11　　　A　I was.
12　　　Q　Then as well, the shipment reflected in
13　Exhibit No. 10?
14　　　A　I was.
15　　　Q　So that's four shipments?
16　　　A　That's correct.
17　　　Q　I don't believe you've produced any
18　records identifying the contents of the first shipment
19　or the second shipment; is that correct?
20　　　A　I don't think --
21　　　Q　Do you know if anybody had charge of
22　identifying what the specific nature of the contents of
23　each box of records that were shipped in each of those
24　deliveries?
25　　　A　I don't recall anybody on our end that

Page 168

1　had responsibility for that.
2　　　Q　To the best of your knowledge, was it
3　ever done?
4　　　A　I have no idea.
5　　　Q　The second shipment was a shipment of
6　certain records that went to the accounting office
7　10 miles down the road. Did anybody make a list of
8　those records?
9　　　A　No.
10　　　Q　No inventory of those?
11　　　A　No.
12　　　Q　And then the third was the shipment to
13　the storage facility. Did anybody make a record of the
14　documents that were shipped as part of that third
15　shipment to the storage facility --
16　　　A　I don't believe so.
17　　　Q　-- in Atlanta? That storage facility is
18　in Atlanta?
19　　　A　I believe so.
20　　　Q　So the fourth, which was purportedly the
21　movement or the reshipment of records that were sent to
22　the Atlanta storage facility and moved up to Lenox
23　Health Care in Pittsfield, that I understand is
24　reflected by the documents that comprise Exhibit
25　No. 10; is that right?

Page 169

1　　　A　That is correct.
2　　　Q　Looking at this document addressed to Dan
3　Moore, the second page or the second document of
4　Exhibit No. 10, it refers to contents of Lenox storage,
5　and it says in parentheses, quote, estimate.
6　　　A　Uh-huh.
7　　　Q　I see a column under that that says
8　"approx," abbreviation for "quantity." I assume that
9　stands for "approximate quantity"?
10　　　A　That's correct.
11　　　Q　That would probably refer to box numbers?
12　　　A　I think it's a quantity for each one of
13　the items that are described in the column to the
14　right-hand side.
15　　　Q　Did you prepare this or do you know who
16　prepared this list?
17　　　A　I don't recall who prepared it. It's
18　possible that I did, but I don't recall.
19　　　Q　There's reference to contents of Atlanta
20　storage, and then in the bottom half of that page,
21　there's reference to contents of Atlanta hub office.
22　　　A　Correct.
23　　　Q　What's the distinction?
24　　　A　Contents of the Atlanta hub office, I
25　think this was a request by Lenox to get a

Page 170

1  comprehensive listing of everything that was left in
2  Atlanta, both in storage as well as in our accounting
3  hub office, which is the one that I've referred to
4  before.
5       Q    The one that was 10 miles away from
6  NewCare?
7       A    Right.
8       Q    Do you have any knowledge what these
9  records consist of even looking at the descriptions
10  here?
11      A    The only thing that I see is -- the only
12  reference I see to records is a line item five down
13  that says 199 boxes of records from '96 and prior.
14      Q    Do you know anything about those?
15      A    As I look at this, I seem to recall that
16  there was some schedule that identified boxes and box
17  numbers and what the contents were.  I do seem to
18  recall that there was some schedule that detailed what
19  was in each box by box number, but I don't recall where
20  that list originated.
21      Q    The next line refers to 10 to 15
22  miscellaneous computers and printers, paren, most non
23  working.  Do you know what that refers to?
24      A    This would have been spare parts out of
25  Gene Gregorchik's office, CPUs, monitors, items such as

Page 171

1  that.
2       Q    So I gather I can infer from the
3  documents that Schaap Moving Systems that has provided
4  the bill of lading is the company that actually
5  transported these particular reports, furniture, and so
6  forth up to Lenox Health Care?
7       A    I don't recall whether they were the
8  final party that was selected.  I don't know if they
9  were the final ones.  I know that we evaluated them.
10  I don't know who we finally ended up deciding on.
11      Q    Looking at the second page, again, the
12  right-most column, is titled, "Purchase by NWCA," and
13  then in the column next to each of the moved items or
14  shipped items there's an entry either "No" or "Yes," or
15  in a couple cases, the word "leased."  Do you know what
16  that column refers to?
17      A    I don't.  I could speculate as to what I
18  think it is, but I don't know what it's intended to
19  represent.
20      Q    Let me ask you this:  You know it's
21  NewCare whose records and property, with the exclusion
22  of the non-NewCare records that were included, that's
23  being transported in these various shipments; right?
24      A    Right.
25      Q    That's what you understand?

Page 172

1       A    Right.
2       Q    But they're being delivered to Lenox
3  Health Care in Pittsfield, which is not the debtor in
4  the bankruptcy case; correct?
5           MR. CHENG:  Objection.
6           THE WITNESS:  The debtor in NewCare's
7  bankruptcy is not Lenox, that's correct.
8       Q    (By Mr. Kelly)  And as you indicated,
9  Lenox Health Care was a live company when all of this
10  was happening?
11      A    Correct.
12      Q    Can you tell me why it is that all the
13  property of NewCare at the Lake Forrest address is
14  being shipped up to Lenox Health Care?  Do you know?
15      A    I don't recall whether that was a
16  directive of the Court or an action of Lenox Health
17  Care.  I don't recall the specifics behind it.  I mean,
18  all we knew was Lenox Health Care is managing this
19  business and we get our direction from Lenox Health
20  Care.  So, again, I don't recall whether it was a
21  request of the bankruptcy court or who it was.
22      Q    Did you ever learn what role, if any, Tom
23  Clarke played in the decision to file the Chapter 11
24  petition for bankruptcy?
25      A    For NewCare Health Corp.?

Page 173

1       Q    Yes.
2       A    I don't know that I know what role he
3  played in it.
4       Q    Did you ever have any conversations with
5  Mr. Brandt, the examiner appointed by the bankruptcy
6  court in the NewCare bankruptcy?
7       A    I seem to recall several conversations
8  with him, yes.
9       Q    What were the subject matters of those
10  conversations?
11      A    I don't recall the specifics of those
12  conversations.  It was not uncommon for him to call and
13  ask a question about Medicare reimbursement or, you
14  know, the status of equipment or movement or just
15  random questions regarding unaffiliated companies, but
16  I don't recall any specific conversations.
17      Q    Do you have any memory that the operating
18  assets of NewCare were sold as part of the bankruptcy
19  before the end of 1999?
20           MR. CHENG:  Objection.
21           THE WITNESS:  I'm not familiar with a
22  sale of the NewCare assets.
23      Q    (By Mr. Kelly)  What about conversations
24  with David -- who is David Tolly, T-O-L-L-Y?
25      A    I don't know his specific title.  I think

44 (Pages 170 to 173)

**B**

# In The Matter Of:

*Weiner v.*
*Brogdon, et al.*

---

*Thomas M. Clarke*
*November 7, 2003*

Vol. 1

---

## LEGALINK - BOSTON
*320 Congress Street, 4th Floor*
*Boston, MA 02210*
*PH: 617-542-0039 / FAX: 617-542-2119*



**LEGALINK**®

A **WORDWAVE** COMPANY

Page 62

1  May 1999, between NewCare and --
2         MR. CHENG: 6?
3         MR. KELLY: Exhibit No. 6.
4     Q. -- Lenox Healthcare, Inc. And Exhibit No.
5  7, purports to be a document titled "Management
6  Services Agreement," dated the 21st day of May 1999,
7  between the same two parties. I ask you to just scan
8  both of them, please.
9     A. Okay.
10    Q. Have you had an opportunity to examine both
11 exhibits?
12    A. Yes.
13    Q. First of all, let's just go to the
14 signature pages of each of them, which are the last
15 pages of each document. Would you agree with me that
16 each such document has been executed by you on behalf
17 of Lenox Healthcare and purportedly by Chris Brogdon
18 as chairman on behalf of NewCare Health Corporation?
19    A. Yes.
20    Q. Let's talk about the Management Services
21 Agreement first, which is 7. Do you remember these
22 agreements, by the way?
23    A. I know that every health care facility that
24 we managed has a management agreement. I don't

Page 63

1  specifically remember these two agreements. I know of
2  their existence. I couldn't tell you how many pages
3  they were. I couldn't tell you what the provisions
4  were.
5         I can tell you that they had a provision
6  about responsibilities, compensation. You know, they
7  could be signed in counterparts probably, but I don't
8  have specific recall on these two agreements.
9     Q. Subject to that, do you have a memory of,
10 in fact, signing such agreements with NewCare?
11    A. I don't have a memory of signing them, but
12 we have a corporate policy at Lenox that Linda Clarke
13 and I are the only officers authorized to execute
14 third-party agreements. So I would assume that my
15 signature would have been on these agreements.
16    Q. Do you have a memory that you, in fact, did
17 enter into such agreements with NewCare,
18 substantially?
19    A. I know that we started managing NewCare at
20 some point in June, yes.
21    Q. In summary what does a management services
22 agreement do?
23    A. I would assume that a management services
24 agreement -- you're speaking generic?

Page 64

1     Q. No. I'm speaking with reference to Exhibit
2  No. 7.
3     A. I believe it outlines the responsibilities
4  of the manager and the responsibilities of the owner,
5  with respect to the day-to-day management of the
6  health care facility.
7     Q. Was Lenox Healthcare the manager pursuant
8  to this agreement?
9     A. Yes.
10    Q. What was the function of the manager
11 pursuant to such an agreement?
12    A. Would you like me to read the
13 responsibilities of the manager?
14    Q. No. Just summarize, from your knowledge
15 and memory, to generally what it is.
16    A. It looks like the responsibilities included
17 maintenance of licenses, compliance with law,
18 contracts, promotional activities, personnel
19 administration, invoicing, bookkeeping, maintenance,
20 utilities and supplies, patient trust account,
21 maintenance of taxes and grants, licensure.
22    Q. In more broader terms, what is it that
23 Lenox Healthcare was agreeing to do for NewCare
24 pursuant to this agreement?

Page 65

1     A. Provide day-to-day management of the health
2  care facilities.
3     Q. Now, having seen the documents you've seen
4  so far, does it change or modify in any way your
5  earlier testimony about Lenox Healthcare's agreement
6  to manage all of NewCare's facilities?
7     A. I mean, the agreement refers to facilities.
8  My assumption is that we're managing all of NewCare's
9  facilities.
10    Q. Where does it refer to that?
11    A. In the opening paragraph. Well, it refers
12 to facilities owned by NewCare Health Corporation.
13    Q. Where are you looking, Mr. Clarke?
14    A. Just in the opening paragraph of the
15 management services agreement.
16    Q. In the opening paragraph, it refers to an
17 agreement by and between NewCare Health Corporation, a
18 Nevada corporation, owning or leasing or managing any
19 facilities. It does refer in that same paragraph at
20 the end to, quote, The Facilities are those which are
21 currently operating as well as those future operations
22 as may be approved Owner's Board of Directors, close
23 quote. Is that right?
24    A. Yes.

17 (Pages 62 to 65)

**2**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### Western Division

|  |  |
|---|---|
| In Re:    ) <br> ) <br>      NEWCARE HEALTH CORPORATION, ) <br>      et al.,    ) <br> ) <br>            Debtors.    ) <br> ) | CHAPTER 7 <br> CASE NUMBER: 99-44161-HJB, et al. <br> Jointly Administered |

|  |  |
|---|---|
| GARY M. WEINER, Chapter 7 Trustee    ) <br> for the estate of NEWCARE HEALTH    ) <br> CORPORATION, et al.,    ) <br>            Plaintiff    ) <br> ) <br> vs.    ) <br> ) <br> CHRISTOPHER F. BROGDON, et al.    ) <br>            Defendants    ) | ADVERSARY PROCEEDING <br> NO: 01-4188-HJB |

## AFFIDAVIT OF PHILIP M. REES

I, Philip M. Rees, being duly sworn, do hereby depose and say as follows:

1.    I am a defendant in the above-captioned adversary proceeding, and I make this

Affidavit in support of Defendants' Motion to Compel Production of Documents.

2.    I have personal knowledge of the facts set forth in this Affidavit.

3.    I am an attorney licensed to practice law in the state of Georgia. I was employed

as General Counsel to NewCare Health Corporation ("NewCare") from July 1998 to July 1999,

and served in that capacity for several months prior to my paid employment period. I also served

as the Secretary of NewCare from the spring of 1997 to July 1999.

4.    In my capacity as General Counsel to NewCare, I maintained the legal files of

NewCare along with certain other business files of NewCare.

5. It is my understanding that the Chapter 7 Trustee is storing documents including most of the books and records of NewCare in a warehouse called the Bay State Records Center in Chicopee, Massachusetts (the "Chicopee Warehouse").

6. The Trustee's counsel, Paula M. Bagger, has provided my counsel at Burns & Levinson LLP a document index (hereinafter the "Trustee's Document Index") that purports to identify the boxes being stored by the Trustee in the Chicopee Warehouse.

7. On October 8, 2003, I, along with Victoria L. Schmidt, one of the defendants' attorneys at Burns & Levinson LLP, reviewed approximately 35 boxes of documents at the Chicopee Warehouse.

8. On information and belief, the particular boxes I reviewed were selected by Attorney Schmidt using the Trustee's Document Index and the box numbers stated therein.

9. Upon reviewing the boxes Attorney Schmidt had designated, I determined that there were errors in the Trustee's Document Index as discussed below.

10. The box designated "Box 79" in the Trustee's Document Index contained folders for facilities that were not listed for that box in the Trustee's Document Index. In particular, Box 79 contained folders concerning Doctor's Hospital of Groves, Texas and Hampden Nursing Homes. Neither of these facilities is listed in the Trustee's Document Index for Box 79.

11. The box designated "Box 155" in the Trustee's Document Index contained documents, specifically 10-Q's, 10-K's, financial statements, and annual reports for Retirement Care Associates, Inc.; yet neither these documents nor Retirement Care Associates are mentioned in the Trustee's Document Index for Box 155.

12. The Trustee's Document Index states that the box designated "Box 160" contains "A/P 700 NewCare Health Corporation 10/97; Book Keeping Manual; NewCare Health

Corporation Summary Plan Description"; yet the box only contained NewCare Accounts Payables for 1990 and 1991.

13.     The box designated "Box 191" in the Trustee's Document Index contained documents concerning the Meadowood facility, specifically a lease, an environmental assessment, an income statement and correspondence; yet there is no mention of Meadowood in the Trustee's Document Index for Box 191.

14.     The box designated "Box 198" in the Trustee's Document Index contained approximately 20 copies of the 1997 NewCare Annual Report; yet there is no mention of the Annual Report in the Trustee's Document Index for Box 198. Box 198 also contained approximately 11 copies of the OneHealth Preferred Provider directory; yet there is no mention of this document in the Trustee's Document Index for Box 198.

15.     The Trustee's Document Index states that the box designated "Box 278" contains "Legal and Licensure; HCFP; NewCare Gov't Regulations and Filings; NewCare – Material Agreements; NewCare Miscellaneous; NewCare Mass IV." In this instance, the index's general reference to the files in the box was accurate. These files were legal files kept by me when I was General Counsel to NewCare. As I observed them at the Chicopee Warehouse, however, these files are not being maintained by the Trustee as they were kept in the usual course of business of NewCare. At NewCare, all the legal files were arranged alphabetically. By contrast, the files in the Trustee's box were not kept in alphabetical order. Also, the folder marked "NewCare Mass IV" contained documents that were mostly unrelated to NewCare Mass IV, which is not how the documents were kept in the usual course of business at NewCare.

16.     There were other problems with the documents kept by the Trustee in the box designated "Box 278." Volume I of the NewCare Massachusetts acquisition file and Volume IV

are located near each other in the box, but with several files in between, none of which are Volumes II, III and IV. In my capacity as General Counsel of NewCare, I kept the volumes of the Massachusetts acquisition files together and in sequential order by volume number.

17.     The Trustee's Document Index states that the box designated "Box 1958" contains documents under the category, "Renaissance fee application." Because of the index description "Renaissance fee application," I was led to believe the box contained information concerning Renaissance Senior Living, Inc., an entity that is relevant to this action. Box 1958, however, actually contained documents concerning Renaissance Cosmetics, Inc., which is in no way affiliated with NewCare or any of the remaining defendants in this adversary proceeding.

18.     The box designated "Box 1958" in the Trustee's Document Index also contained documents concerning Ogden Corp.; yet there is no mention of Ogden Corp. in the Trustee's Document Index for Box 1958. Furthermore, Ogden Corp. is in no way affiliated with NewCare or any of the remaining defendants in this adversary proceeding.

19.     The Trustee's Document Index states that the box designated "Box 1958" also contains the category "correspondence and emails." I could not determine from my review of this category whether Box 1958 contained a document relevant to the adversary proceeding. Consequently, I was forced to review all the documents in the box. I found several documents that were responsive to the defendants' documents requests but many were not responsive.

20.     In several places in the Trustee's Document Index, there are categories entitled "KIRA Files" or "KIRA File Cab." For example, the Trustee's Document Index states that the boxes designated "Box 77" and "Box 79" contain such documents. I reviewed Box 79 and I still do not know what this designation means. The sole description for Box 77 is "KIRA File Cab."

21.    In several places in the Trustee's Document Index, there is a category entitled "Misc. loose papers." There is no possible way to know what these documents are by this designation, without looking through the entire boxes to which the category refers.

22.    We also reviewed a box labeled with Bay State Record Center's Identification Number 364401, which was purportedly a box of NewCare documents. This box contained documents and patient records for Baystate Medical Center in Springfield, Massachusetts. To the best of my knowledge, this facility was never affiliated with NewCare or any of the defendants in any way.

23.    We also reviewed a box labeled with Bay State Record Center's Identification Number 362373. Although the box did contain NewCare documents, there was no box number on the box that corresponds to the Trustee's Document Index. The box contained various legal bills that, in my capacity as General Counsel of NewCare, I kept in the legal files at NewCare. None of these legal bills were kept by the Trustee in the same way that I kept the legal bills, in that they did not appear to be kept by either subject matter or alphabetically.

24.    I know that the Atlanta office of NewCare where I worked until my termination on July 7, 1999, was closed down later in 1999, and I understand that the NewCare business records were shipped to other locations in Georgia and Massachusetts. I did not at any time box any of the NewCare legal or other business records for shipment from NewCare's offices in Atlanta to a location in Georgia or Massachusetts, nor did I direct anyone at NewCare to do so.

25.    To the best of my knowledge and belief, no NewCare employee created the Trustee's Document Index. It is my understanding that the index was created by employees of Lenox Healthcare, Inc. or the Bankruptcy Examiner after NewCare's records were packed in boxes and shipped to Lenox Healthcare, Inc. or the Bankruptcy Examiner.

SIGNED THIS 14 DAY OF JANUARY, 2004, UNDER THE PAINS AND

PENALTIES OF PERJURY.

Philip M. Rees

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### Western Division

|  |  |
|---|---|
| In Re:                   ) | |

In Re:        )

    NEWCARE HEALTH CORPORATION,  )    CHAPTER 7
    et al.,                   )    CASE NUMBER: 99-44161-HJB, et al.

              Debtors.    )    Jointly Administered

                     )

GARY M. WEINER, Chapter 7 Trustee  )
for the estate of NEWCARE HEALTH  )
CORPORATION, et al.,         )
            Plaintiff     )

vs.                   )    ADVERSARY PROCEEDING
                  )    NO: 01-4188-HJB

CHRISTOPHER F. BROGDON, et al.  )
      Defendants      )

## CERTIFICATE OF SERVICE

I, Victoria L. Schmidt, Esq., attorney for the Defendants, do hereby certify that I have this 15th day of January, 2004, served a copy of **Affidavit of Philip M. Rees**, relative to Defendants' Motion to Compel Production of documents Filed by Defendants Christopher F. Brogdon, et al., via facsimile to Paula M. Bagger, Esq., and via first class mail, postage prepaid, upon all other counsel of record.

Victoria L. Schmidt, Esq. (BBO #650999)
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
(617) 345-3292

Dated: January 15, 2004

24983.0/00812230.DOC